DIAMOND DRILL & MACHINE CO. v. KELLY BROS. (No. 3.)

(Circuit Court, E. D. Pennsylvania. January 24, 1903.)

No. 50.

1. PATENTS—COMBINATION—PATENTABLE INVENTION.
    Where, in a machine for inserting wire-coil clasps in belt ends, the result to be attained is the successful insertion of the coil in the belt, that the different parts of the machine contribute to this each in its own time and way constitutes a true combination, which is patentable.

**2. SAME—EVIDENCE AS TO WHO WAS ORIGINAL INVENTOR—OLD MACHINE.**

Where, in a wire-coil machine, the invention claimed is separately operating jaws and rolls, an old operative machine, in which this arrangement appears, constructed by another party some three years earlier, according to the testimony of several who saw and examined it, is sufficiently substantiated to be received as an anticipation.

**3. SAME—ANTICIPATION—MACHINE FOR MAKING AND INSERTING WIRE COILS.**

The Templin patent, No. 593,406, for an improvement in wire-coil machines, whereby the clamping-jaws and coil-rolls are operated independently of each other, while disclosing a patentable device, is void for anticipation by a machine previously constructed by Henry M. Jackson, which embodied the essential and patentable feature of the improvement shown in such patent.

In Equity. Suit for infringement of letters patent No. 593,406, granted November 9, 1897, to Joseph H. Templin, for a wire-coil machine. On final hearing.

W. C. Strawbridge, for plaintiff.

Horace Pettit, for defendants.

ARCHBALD, District Judge.* This suit is based on the patent issued to Joseph H. Templin November 9, 1897 (No. 593,406), for an improvement in wire-coil machines, whereby the clamping-jaws and coil-rolls are operated independently of each other. As decided in another case between the same parties (120 Fed. 289), the pioneer in this field was Calvin Jackson, who procured a patent for a wire-coil machine in September, 1892; but in his machine the fabric in which the coil was to be inserted was held in place by clamping plates carried in two separable frames, in which the upper and lower rolls were respectively set. To adjust these plates to different thicknesses of material and sizes of coils, liners had to be employed; and considerable difficulty was experienced in so doing this as to get just the right pressure at the same time on both coil and material; requiring different sizes of coils, and not a little care in selecting the size to be used. This is entirely obviated by having clamping-jaws and coil-rolls which are operated separately, each being thereby able to be independently adjusted; the clamping-jaws being also made to serve a further and important function of flattening down the coils upon the material after they have been inserted in it, where, as in the case of belt ends, this is desired. These features are embodied in the first claim of the patent, which is for:

"(1) A wire-coil machine having a series of rolls arranged to close upon and rotate an interposed wire-coil, clamping-jaws operating in connection therewith, and separate mechanism for independently opening and closing said rolls and jaws, substantially as set forth."

It is admitted by defendants' expert that this claim is generic in character, and includes any device in which a combination of rolls and clamping-jaws operating separately is to be found, and, as the defendants are manufacturing a machine of which this is true, there can be no question as to their having infringed upon it.

It is contended, however, that the claim sets forth a mere aggregation of parts old and well known, and reference is made to the Adt

* Specially assigned.

(1876) and Gandy (1885) patents, where, as it is said, independent clamping-jaws, as well as adjustable and separately operating rolls, are to be found. These are not cited, as I understand it, to establish anticipation, but simply to show the well-known character of these particular parts. I shall not stop to consider whether they are effective for that purpose or not. It is sufficient to inquire, in response to the argument we are considering, whether the elements which we find in the claim in controversy form a true combination, amounting to a patentable device. It seems to me that they do. Having regard to the difficulties encountered in machines in which the rolls and clamping-jaws were operated in conjunction, already alluded to, it was a material advance, of marked usefulness, to escape from them by a mechanism whereby, as here, the two were operated separately. The result to be attained was the successful insertion of the coil in the belt end or other material, and to this the different parts of the machine contributed, each in its own time and way. This makes out a true combination, and that is all that needs to be said.

This brings us to the real question in the case, which is whether Templin, under whom the plaintiffs claim, was in fact the original and first inventor in a wire-coil machine, of independently operating jaws and rolls, or whether, as contended by the defendants, this distinction belongs to Henry M. Jackson, a brother of Calvin Jackson, already alluded to as the pioneer in this field. Each of these parties holds a patent; that to Templin having been issued, as stated above, on November 9, 1897, and that to Henry M. and G. M. Jackson, another brother, on November 30th of the same year. The one is three weeks after the other, but is based on an application which is five weeks earlier; the Jacksons having applied on March 31, 1897, and Templin not until May 4th following. Judged by the record, the later patent represents the earlier invention, and, to show it otherwise, the plaintiffs are therefore compelled to resort to further proof. To maintain their priority, they have accordingly introduced evidence which would carry the invention of Templin back to March or April, 1896, while, on the other hand, to overcome this, the defendants produce a machine alleged to have been constructed by Henry M. Jackson as early as March, 1893,—some three years previous. This old machine differs materially from that covered by the Henry M. and G. M. Jackson patent, and is not pretended to be the basis of it. But it has separately operating jaws and rolls, and, as that is the whole of the claim in suit (no particular form of mechanism being specified), it effectually anticipates the Templin patent, if sustained, and deprives the patentee of the right to claim that he was the original inventor of this idea. The case turns, therefore, on the view taken with regard to the evidence produced on the one side and the other upon this issue.

I am satisfied that Templin, when he sketched the rough drawings which have been exhibited, had at least a conception, and perhaps a working outline, of the features which are now found in the ponderous machine called the "Jumbo," afterwards completed according to his instructions, and eventually made the basis of the patent in suit. These drawings must have been as early as March or April, 1896,

for he went to the hospital in the latter month, and, before doing so, gave directions by which certain parts of the machine were started. It must be confessed, however, that the drawings are unintelligible to any one except the, inventor, and are very crude and rudimentary, to be accepted as evidence of a definite and completed invention. He did not communicate his ideas to any one at the time, nor were his instructions such that they could be fully followed out in his absence, but admittedly had to await his return from the hospital, and even then very little progress was made with them for several months. According to his own statement, also, what he did was largely experimental; and the Jumbo, even after it was completed, in November, 1896, was still regarded in that light. It is also difficult to understand, if this important improvement in wire-coil machines was clearly developed in his mind in the spring of 1896, why he did not include it in the Templin & Ternstedt patent, which was applied for June 22, 1896, just about this time. It was known that Henry M. Jackson had a machine of some kind, and an effort was made to have him turn it over, so that there was strong reason for bringing forward everything to which the patentees could lay claim; and yet there is nothing in the application to suggest the separate operation of jaws and rolls which is now contended for. Were I put to it, therefore, I should find it difficult to hold that, at the time the drawings were originally laid out, the ideas of the inventor had advanced much beyond a mere beginning.

On the other hand, there can be no question as to the existence of the Henry M. Jackson machine as early as July 16, 1896, when he applied for his first patent, for the diagrams which accompanied the application show it exactly as it now is, except that the jaws are V shaped, instead of being serrated. No claim was made for the separate operation of the rolls and jaws, but that is not material. It was a feature of the machine, and that is enough for our present purposes. It thus appears that at the time when Templin was trying to work out something of this character, and long before he had actually produced anything definite or tangible, Henry M. Jackson had a complete working device in which such a combination as is found in the patent in suit was clearly employed. If, then, the plaintiffs are entitled, on their part, to rely upon the Jumbo in November, 1896, as evidence to support the claim that Templin was the original and first inventor, by the same consideration the defendants are entitled to bring forward the Jackson machine in July, 1896, if no earlier; and, of the two, the latter is four months in advance upon the scene. But the evidence does not stop there; and even if Templin is permitted to carry back his conception to the earliest point claimed for it, in March or April, 1896, the Jackson machine still anticipates him. Henry showed it to his brother Calvin in April or May of that year, according to the testimony of both these parties, and through Calvin the fact that he had an invention of some kind was brought to the attention of Templin, who, early in June, went to see him, and tried to get him to transfer his rights, first by persuasion, and, when that failed, by threats. The feature of the machine that particularly interested both Henry and Calvin was the corrugated jaws,

and the doing away with right and left hand coils, while the fact that they were separately operated does not seem to have impressed them. Some claim was made by Calvin that he was the inventor of these corrugations, and, on the strength of this, when it was supposed that Henry would turn over his rights, he proposed to join with Templin in the application which subsequently resulted in the Templin & Ternstedt patent. But when he found that his brother Henry held out, and that his interests were not taken care of, he withdrew; and Ternstedt, a draftsman in the plaintiffs' employ, who had furnished some suggestions, was substituted. This is not very material, but it is a part of the story, and it serves to show that prior to the negotiations leading up to the Templin & Ternstedt patent, in May and June, 1896 (that patent having been applied for on June 22d), Henry's machine was in existence, as he claims; thus carrying it back just so much farther, and establishing it as a perfected device close to the time when Templin, admittedly, had only begun to put his ideas into shape. This is not a case, it is true, in which there is a contest between two parties for the same patent, based on similar inventions, so that it involves no question as to reasonable diligence, or who first reduced his ideas to a practical form. It is simply whether, at the time that Templin conceived of having the rolls and jaws separately operated, the Henry M. Jackson machine, which shows such a separation, was already in existence; depriving Templin of the right to claim that he was the originator of that idea. Adhering strictly to this issue, and relying simply on the evidence so far alluded to, there can be little doubt that such was the case.

I am persuaded, however, that a much earlier origin is to be assigned to this old machine. A number of witnesses testify that they saw it in March or April, 1893, and I do not see why they are not to be believed. It is true that they are all relatives of Henry M. Jackson,—his wife, his father-in-law, Levi F. Noll, his brother-in-law, William Noll; and Charles A. Miller, his wife's cousin; but their testimony is too circumstantial to be set aside on the ground of mere relationship. This is particularly true of William Noll and Charles A. Miller,—the one a machinist and the other a fireman at the time on the Reading Railroad. I have carefully read what they have to say, and am convinced of its truth. It is no made-up story to fit the case, but a narrative of actual occurrences. The time when the machine was seen by each of these witnesses is also fixed by reference to other events, which lessens the chance of their having made a mistake; Miller, for example, stating that he wanted to lace a piece of leather with the machine, and show it to some of the railroad employés, and that he was not in the service of that railroad except in 1893. The machine itself lends countenance to all that is said of it. If it had been manufactured for the occasion, it would have been made to fit it better. Several arguments are advanced to weaken the evidence in its favor. It is said, for instance, that it is unreasonable to suppose that Henry M. Jackson would not disclose this machine to his brother Calvin, with whom he was closely associated for over three years after it was put together, while at the same time, as is testified, it was freely exhibited to others. But he

sufficiently meets this by the suggestion that he did not care to give away the invention even to his brother, especially in view of his association with the plaintiff company; and, as to those who say they saw it in the spring of 1893, they did so at his house, or when he was moving, when it could not be kept from view. Considerable stress is also laid on the fact that in April, 1896, as agent for the plaintiffs, in whose employ he then was, he sold to Deysher a machine which was to have the jaws corrugated; the contention being that if at that time he had this old machine, with the corrugations which are found in it, he would not be likely to let such a sale pass without comment. There is no doubt that he made the sale to Deysher, although he does not remember it; but that he was called upon on that account to say anything about his own affairs, I fail to see. It was, perhaps, to be expected that the apparent appropriation of his ideas in this way would lead him to prompt action in applying for the patent, and it is to be noted that it is not long after this that he does so. But that he kept his own counsel and said nothing is certainly of no significance. It is not nearly so marked a circumstance as the omission of Templin to include in the Templin & Ternstedt patent the idea of separately operating jaws and rolls, which he claims was fully developed in his mind at the time. The delay of Henry M. Jackson in applying for the patent is also urged, and if this were a controversy with others claiming the same invention, involving the validity of the patent which he subsequently obtained, the delay of over three years with which he is chargeable might operate seriously against him in favor of those who had meantime acted with greater diligence. Nor could it well be excused on the plea of not having the necessary means, since he could just as well have borrowed in the beginning as he did in the end. But that is not the question. It is merely whether the admitted delay discredits the age which is claimed for his machine, and I do not see that it necessarily does. It may tend in that direction, and, in a case of doubt or one less satisfactorily established, might be sufficient to turn the scale against it. But to my mind, the evidence is not doubtful, but convincing. The witnesses tell consistent stories, which bear the impress of truth, and it is merely a question whether they are to be believed. I am satisfied that they should be, and it would go against both my conscience and my judgment to hold otherwise. Even conceding to the plaintiffs, therefore, everything for which they contend with regard to the time when Templin conceived of separately operating rolls and jaws, we have in the Henry M. Jackson machine of 1893 a device of the same character, antedating Templin by over three years. This machine was not a mere experiment, but was tested and proved competent; a properly laced belt end being turned off from it by the inventor soon after it was put together. It stands as a complete anticipation, therefore, of the patent in suit; depriving it of its novelty and validity, and entitling the defendants to a decree.

Let a decree be drawn dismissing the bill, with costs.